IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH:**<br><br>**FACEBOOK USER ID NAME "STEPHEN PURKS"/USER ID "100022782518174"**<br><br>**THAT IS STORED AT PREMISES CONTROLLED BY FACEBOOK INC.** | Case No. 5:21mj00015 |

**AFFIDAVIT IN SUPPORT OF
APPLICATIONS FOR SEARCH WARRANTS**

I, Thomas F. Hickey, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application for a search warrant for information associated with a certain Facebook User ID that is stored at premises owned, maintained, controlled, or operated by Facebook Inc. ("Facebook"), a social networking company headquartered in Menlo Park, California, which is located in the Northern District of California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information in its possession pertaining to the subscriber or customer associated with the following account:

(1) User ID "Stephen Purks" and user identification account number 100022782518174,

hereafter referred to as **SUBJECT ACCOUNT**

2. I have been a Special Agent with the United States Drug Enforcement Administration (DEA) since February 1999. I am currently assigned to Enforcement Group 49, Winchester Resident Office, of the DEA Washington Division Office and am co-located with the Northwest Virginia Regional Drug and Gang Task Force (NWVRDGTF). I have received training in all areas of narcotics investigations including search and seizure laws and statutes pertaining to enforcement of the Controlled Substances Act. Since becoming a federal law enforcement officer in 1992, I have either conducted or assisted other law enforcement officers in conducting numerous narcotics investigations that have resulted in the arrest and conviction of numerous individuals.

3. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and documents. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. § 846 and 21 U.S.C. § 841(a) have been committed by STEPHEN PURKS. There is also probable cause to search the information described in Attachment A for evidence of these crimes, as described in Attachment B.

## PROBABLE CAUSE

5. I have participated in the investigation of the drug trafficking activities involving APRIL MOSLEY, ASHLYN GATES, CATHERINE REC, JESSICA GROTE, STEPHEN PURKS, and others both known and unknown to the investigation. During this joint DEA and NWVRDGTF investigation, law enforcement determined that this drug trafficking organization

is a network of methamphetamine distributors residing and operating in Virginia and West Virginia, supplied by conspirators in Florida.

6.  During this investigation, your Affiant has developed information to believe that STEPHEN PURKS used the **SUBJECT ACCOUNT** to communicate with individuals for the purpose of engaging in drug trafficking.

7.  In or around September 2020, the NWVRDGTF and the DEA identified ASHLYN GATES as a source of supply for methamphetamine in the Winchester, Virginia area. Source information indicated GATES was supplied through sources in Florida via the U.S. mail. A postal inspector with the U.S. Postal Inspection Service was able to track a package to GATES and, pursuant to a federal warrant obtained in the Eastern District of Virginia, seize and search the package at an U.S. Postal Service facility in Dulles, Virginia in September 2020. Among other items, the package contained approximately 1 ounce of a white, rocklike substance. The substance was sent to the DEA Mid-Atlantic Laboratory and was found to be 27.813 grams of methamphetamine.

8.  In the meantime, the NWVRDGTF developed a Confidential Source ("CS-1") that was able to arrange a controlled purchase of methamphetamine from GATES in September 2020. (CS-1 began serving as a confidential source with the NWVRDGTF after he/she was charged with Possession with the Intent to Distribute Methamphetamine with the understanding that such effort with help him/her with his/her state criminal charges. CS-1 was interviewed as to his/her involvement with GATES and provided information against his/her penal interest. This information has been corroborated through this investigation.) While arranging the deal, GATES advised CS-1 that she was sending another person to complete the transaction. CS-1 purchased $100 of suspected methamphetamine from GATES's co-conspirator on September

16, 2020. This transaction was arranged through the use of Facebook Messenger.

9. In September 2020, the NWVRDGTF developed a second Confidential Source ("CS-2"), who provided information regarding GATES and stated he/she was able to purchase methamphetamine from GATES. (CS-2 was approached by NWVRDGTF officers regarding his/her involvement with the distribution of methamphetamine and GATES, and provided information against his/her penal interest. This information has been corroborated through this investigation. In addition, CS-2 admitted to having a prescription for medicinal marijuana and possessed marijuana while he/she has interactions with the NWVRDGTF.) Specifically, among other statements, CS-2 advised law enforcement that GATES was located at the Holiday Inn Express Room #320, in Stephens City, Virginia, and had roughly 1/2 ounce of methamphetamine inside the hotel room that was just mailed to her from Florida. Working with law enforcement, CS-2 then purchased ¼ ounce of suspected methamphetamine for $300.00 from GATES. The substance was sent to the DEA Mid-Atlantic Laboratory and was found to be 7.118 grams of methamphetamine.

10. Some of the communications with GATES occurred using Facebook Messenger. Law enforcement obtained a state search warrant for GATES's Facebook account. Information during the time period of May 1, 2020 through October 19, 2020 relating to GATES's account was subsequently released by Facebook to law enforcement. I have reviewed some of the materials provided by Facebook and have observed multiple drug-related conversations and photographs, to include photographs of receipts of U.S. Postal Service ("USPS") transactions, which, based on the conversations, appear to be shipments of methamphetamine to GATES and others.

11. In January 2021, the NWVRDGTF and DEA developed a third Confidential Source ("CS-3"), who provided information regarding GATES and APRIL MOSLEY. CS-3 stated s/he was able to purchase methamphetamine from APRIL MOSLEY. (CS-3 was approached by DEA and NWVRDGTF officers regarding his/her involvement with the distribution of methamphetamine and provided information against his/her penal interest. This information has been corroborated through this investigation.) Specifically, among other statements, CS-3 advised law enforcement that MOSLEY lives in Florida and ships the methamphetamine to Virginia.

12. Through law enforcement's review of GATES's Facebook account, MOSLEY was identified as a coconspirator and one of the Florida-based methamphetamine sources of supply for GATES and at least one other individual. I have reviewed some of the materials provided by Facebook and have observed multiple drug-related conversations between GATES and MOSLEY. For example, in May 2020 MOSLEY informed GATES that she just left the post office and that GATES should have the package no later than Tuesday, which GATES acknowledged. MOSLEY provided a USPS tracking number in this exchange. There are several more exchanges similar to this one throughout GATES's Facebook Messenger account. In other exchanges, MOSLEY confirmed her cellphone number, and, in another, her home address in Florida so that GATES could send her "molly," which is a slang term for the controlled substance MDMA.

13. There are also multiple Facebook Messenger exchanges between the two regarding GATES sending money to MOSLEY via PayPal and Cash App money transfer applications to pay for suspected methamphetamine.

14. On February 5, 2021, law enforcement obtained a federal search warrant for

MOSLEY's Facebook account. Information during the time period of September 2009 through February 2021 relating to MOSLEY's account was subsequently released by Facebook to law enforcement. I have reviewed some of the materials provided by Facebook and have observed multiple drug-related conversations and photographs, to include photographs of what appears to be crystal methamphetamine, which, based on the conversations, appear to be shipments of methamphetamine to MOSLEY at the direction of PURKS and others.

15. Through law enforcement's review of MOSLEY's Facebook account, PURKS was identified as a coconspirator and the Florida-based methamphetamine source of supply for MOSLEY, GATES, and at least one other individual. I have reviewed some of the materials provided by Facebook and have observed multiple drug-related conversations between MOSLEY and PURKS. For example, in December 2020 PURKS sent several photographs of crystal methamphetamine and screenshots of crystal methamphetamine in a group chat with his daughter and MOSLEY. In turn, MOSLEY asked him why he was sending those photographs in the group chat. I have seen multiple messages with MOSLEY and PURKS via Facebook Messenger where MOSLEY is advising PURKS that a buyer has sent a payment to them for drugs. I have seen Facebook Messenger conversations between the two where PURKS instructs MOSLEY to send more methamphetamine.

16. In a series of Facebook Messenger contact between MOSLEY and PURKS (using the **SUBJECT ACCOUNT**) on November 9, 2020, MOSLEY advised that a methamphetamine buyer sent money and requested additional methamphetamine. PURKS asked MOSLEY if she knew if "sis did that today" to which MOSLEY replied "Yep. She did. I already sent Cat the tracking #/".

17. I have seen a Facebook Messenger thread between April MOSLEY and the

**SUBJECT ACCOUNT** dated November 10, 2020 where MOSLEY sends PURKS a screenshot of a USPS tracking notice that shows a parcel is ready for pickup. MOSLEY asks PURKS, "What the hell." PURKS replies that he does not know what that is about and instructs MOSLEY "don't go get shit." MOSLEY advises that she did not go get it and "Cat text me. She has a problem too. No I didn't. Its not in my name anyways." Approximately a half hour later MOSLEY advised that now the tracking app shows the parcel has been delivered. MOSLEY confirms receipt of the parcel later that evening. In a Facebook Messenger post with the **SUBJECT ACCOUNT,** MOSELY advised PURKS "So I got 8 here an Cat got the 1 that woulda made 9." MOSLEY later advised PURKS that "All that came to the house weighed out." Your affiant believes the "9" MOSLEY references is 9 ounces of crystal methamphetamine.

18.     There are also multiple Facebook Messenger exchanges between the **SUBJECT ACCOUNT** and MOSLEY regarding payments to MOSLEY via PayPal and Cash App money transfer applications to pay for suspected methamphetamine.

19.     On March 14, 2021, a preservation request was submitted to Facebook for the **SUBJECT ACCOUNT**.

**INFORMATION ABOUT FACEBOOK**

20.     Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

21. Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

22. Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

23. Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

24. Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their

whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

25. Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

26. Facebook users can exchange private messages on Facebook with other users. Those messages are stored by Facebook unless deleted by the user. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a chat feature that allows users to send and receive instant messages through Facebook Messenger. These chat communications are stored in the chat history for the account. Facebook also has Video and Voice Calling features, and although Facebook does not record the calls themselves, it does keep records of the date of each call. If a Facebook user does not want to interact with

another user on Facebook, the first user can "block" the second user from seeing his or her account.

27. Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

28. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

29. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

30. Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

31. In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

32. Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a

Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

33. Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

34. As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's "Neoprint," IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which

users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

35. Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

36. In my training and experience, because of the ubiquity of Facebook and the privacy and convenience of its Messenger application, which can be used on different types of cellphone devices, an increasing number of drug traffickers are using Facebook Messenger to communicate regarding drug trafficking. Here, MOSLEY communicated consistently and repeatedly with PURKS (and others) through her Facebook account regarding the operations of the drug trafficking operation under investigation. There is probable cause to believe that

PURKS used the **SUBJECT ACCOUNT** to communicate with individuals regarding the distribution of drugs and that such communications could lead to additional evidence as well as the identification of additional conspirators.

### INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

37. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A), and Rule 41 of the Federal Rules of Criminal Procedure by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

### CONCLUSION

38. Based on the forgoing, I request that the Court issue the proposed search warrant.

39. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is a court that "has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

40. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

## OATH

The information in this affidavit is true to the best of my knowledge and belief.

Respectfully submitted,

/s/Thomas F. Hickey
Thomas F. Hickey
Special Agent
Drug Enforcement Administration

Received by reliable electronic means and sworn and attested to by telephone on March 19th, 2021.

_____
JOEL C. HOPPE
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

**Property to Be Searched**

This warrant applies to information associated with the Facebook user ID "Stephen Purks" and user identification account number 100022782518174 ("**SUBJECT ACCOUNT**"), that is stored at premises owned, maintained, controlled, or operated by Facebook Inc., a company headquartered in Menlo Park, California.

## ATTACHMENT B

**Particular Things to be Seized**

**I.      Information to be disclosed by Facebook**

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook Inc. ("Facebook"), including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each user ID listed in Attachment A:

(a) All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(b) All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

(c) All photos and videos uploaded by those user IDs and all photos and videos uploaded by any user that have that user tagged in them;

(d) All profile information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e) All other records of communications and messages made or received by the user, including all private messages, chat history, video calling history, and pending "Friend" requests;

(f) All "check ins" and other location information;

(g) All IP logs, including all records of the IP addresses that logged into the account;

(h) All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

1

(i) All information about the Facebook pages that the account is or was a "fan" of;

(j) All past and present lists of friends created by the account;

(k) All records of Facebook searches performed by the account;

(l) All information about the user's access and use of Facebook Marketplace;

(m) The types of service utilized by the user;

(n) The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(o) All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(p) All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

## II. Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of violations of 21 U.S.C. § 841 involving STEPHEN PURKS and others, including information pertaining to the following matters:

(a) Evidence of drug distribution by STEPHEN PURKS, APRIL MOSLEY, ASHLYN GATES, and/or others;

(b) Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

(c) Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation;

(d) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s); and

(e) The identity of the person(s) who communicated with the user ID about matters relating to drug distribution, including records that help reveal their whereabouts.

# CERTIFICATE OF AUTHENTICITY OF DOMESTIC BUSINESS RECORDS PURSUANT TO FEDERAL RULE OF EVIDENCE 902(11)

I, _____, attest, under penalties of perjury under the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this declaration is true and correct. I am employed by Facebook, and my official title is _____. I am a custodian of records for Facebook. I state that each of the records attached hereto is the original record or a true duplicate of the original record in the custody of Facebook, and that I am the custodian of the attached records consisting of _____ (pages/CDs/kilobytes). I further state that:

a. all records attached to this certificate were made at or near the time of the occurrence of the matter set forth, by, or from information transmitted by, a person with knowledge of those matters;

b. such records were kept in the ordinary course of a regularly conducted business activity of Facebook; and

c. such records were made by Facebook as a regular practice.

I further state that this certification is intended to satisfy Rule 902(11) of the Federal Rules of Evidence.

_____     _____
Date                                                                Signature